## Keen's Estate.

*James A. Walker*, for exceptant; *John Stokes Adams*, contra.

GEST, J., Dec. 7, 1928.—Mabel C. Keen died in 1923, at the age of twenty-six, intestate, unmarried and without issue. She left surviving her a twin sister, Beatrice Keen Wescoat (since deceased), and two half sisters, Adelaide K. Warren and Anna M. Campion, who are the children of the decedent's father by a prior marriage. The estate of Mabel C. Keen here accounted for consists of personal property derived from her mother, Estella M. Keen, in 1907. The decedent from early childhood was admittedly · *non compos mentis*, although she had not been declared a lunatic or feeble-minded under statutory provisions.

In accordance with the provisions of the Intestate Act of 1917, the Auditing Judge awarded the balance for distribution in equal third parts among the intestate's two half sisters and the executor of her deceased full sister Beatrice. The executor of Beatrice filed these exceptions, claiming that the entire fund (derived from her mother) should have been awarded to him because he represented the sister of the whole blood, to the exclusion of the half sisters of the decedent.

We might well dismiss the exceptions without discussion upon the authority of our Intestate Act, but, in recognition of the antequarian researches of the learned counsel for the exceptant, we will elaborate our opinion.

It is contended in behalf of the exceptant that "the laws of testacy and intestacy cannot apply to persons *non compos mentis*. They may not die testate because of lack of mentality; they are obliged to die without a will. When they die, they must of necessity die will-less, and their inherited property should go, not under the intestate laws, which apply only to those who choose to die intestate, but such inherited property should revert back to the blood of the bequeathing ancestor."

It is argued that unless there is some statute which specifically provides for the inheritance or distribution of the property of an insane person, recourse must be had to the common law on the subject, and we are referred to the ancient Statute De Prerogativa Regis, enacted in 17 Edw. II, Cap. IX, enacted in 1324, as showing the common law rule. Chapter IX of this statute the original of which may be found in 1 Ruffhead's Stat. at Large, 181 (concerning the King's Prerogative in the Custody of Lands of Idiots), is as follows: "*Rex habet custodiam terrarum fatuorum naturalium, capiendo exitus earundem sine vasto et destructione et inveniet eis necessaria sua de cujuscumque feodo terre ille fuerint; et post mortem eorum reddat eas rectis*

*heredibus ita quod nullatenus per eosdem fatuos alienentur vel eorum here-des exheredentur,"* or, in the vulgar tongue, "The King shall have the custody of the lands of natural fools, taking the profits of them without waste or destruction, and shall find them their necessaries, of whose fee soever the lands be holden. And after the death of such idiots, he shall render them to the right heirs; so that by such idiots no alienation shall be made, nor shall their heirs be disinherited." And chapter x (concerning the King's Prerogative in the Preservation of the Lands of Lunatics) is as follows: *"Item habet providere quando aliquis qui prius habuerit memoriam et intellectum, non fuerit compos mentis sue, sicut quidam sunt per lucida intervalla, quod terre et tenementa eorundem salvo custodiantur sine vasto et destructione, et quod ipse et familia sua de exitibus earundum vivant et sustineantur competenter, et residuum ultra sustentationem eorundem rationabilem custodiatur ad opus ipsorum liberandum eis quando memoriam recupaverint. Ita quod predicte terre et tenementa infra prædictum tempus non alienentur. Nec Rex de exitibus aliquid percipiat ad opus suum, et si obierit in tali statu tunc illud residuum distribuatur pro anima ejusdem per consilium ordinarii."* Or, in the vulgar tongue: "Also, the King shall provide when any, that beforetime hath had his wit and memory, happen to fail of his wit, as there are many having lucid intervals, that their lands and tenements shall be safely kept without waste and destruction, and that they and their household shall live and be maintained competently from the issues of the same; and the residue beyond their reasonable sustentation, shall be kept to their use, to be delivered unto them when they recover their right mind; so that such lands and tenements shall in no wise within the time aforesaid be aliened; nor shall the King take anything to his own use. And if the party die in such estate, then the residue shall be distributed for his soul by the advice of the ordinary."

These statutes may be found more accessibly in Shelford on Lunatics, Appendix, page 497.

What this statute has to do with the question before us, we cannot divine. It has no more relevancy than the Statute of Ragman, 4 Edw. I, Coke, 3 Inst. 175; 4 Inst. 186; or the common-law doctrine of Hoghenehyne, Bracton 124 b, Coke, 2 Inst. 669. It simply vested in the King, as *parens patriæ,* the custody of the lands of natural-born idiots, in the one case, and of the lands of those who become insane, in the other, so that the profits might be collected by the King for the benefit of the lunatic and the lands preserved for his benefit or that of his heirs after his death, and, under chapter x: "If the party die in such estate, then the residue (of the profits) shall be distributed for his soul by the advice of the ordinary" *(i. e.,* the Bishop).

In Beverley's Case, 4 Rep. 126 *(a),* there will be found Coke's commentary on this statute.

But even if the Statute De Prerogativa Regis had otherwise any application, it is clear that it never extended to this State, as our Supreme Court has held in so many words in Wright's Appeal, 8 Pa. 57; and indeed it is not to be found in Roberts's Digest of British Statutes. The proposition that our Intestate Act does not apply to the distribution of the estates of persons *non compos mentis* is utterly baseless.

None of our Intestate Acts, including the Act of April 19, 1794, 3 Sm. Laws, 143, and the Act of April 8, 1833, P. L. 315, give the slightest countenance to such a theory, and the present Intestate Act of 1917 is explicit to the contrary, for section 27 in terms provides that "this act shall take effect on the thirty-first day of December, 1917, and shall apply to the estates, real

and personal, of all persons dying intestate on or after said day;" and section 28 provides that "this act of assembly is intended as an entire and complete system for the descent and distribution of the estates, real and personal, of persons dying intestate."

And, furthermore, the Intestate Act of 1917, by sections 9 and 13, completely obliterated all distinctions in descent and distribution as respects persons of the half or whole blood or those not of the blood of the ancestor from whom the estate is derived.

As we said in the beginning, our Intestate Act disposes at one stroke of these exceptions, which are, therefore, dismissed, and the adjudication is confirmed absolutely.